UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

━━━━━━━━━━━━━━━━━━━━━━━

SUSAN BALDWIN,

                Plaintiff,

             v.

**DECISION AND ORDER**
13-CV-485-HBS
(Consent)

NEW YORK STATE, STATE UNIVERSITY OF
  NEW YORK, COLLEGE AT BUFFALO,

                Defendant.

━━━━━━━━━━━━━━━━━━━━━━━

## I.    INTRODUCTION

Pending before the Court is a motion (Dkt. No. 25) by defendant New York State, State University of New York, College at Buffalo ("Buffalo State") for summary judgment dismissing the complaint of plaintiff Susan Baldwin ("Baldwin"). Baldwin alleges that Buffalo State essentially squeezed her out of her job as a professor in retaliation for reporting student complaints of her interim (later permanent) department chairman's sexually graphic language in the classroom. Baldwin claims violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17; and of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681–1688. Buffalo State wants Baldwin's complaint dismissed because it claims to have a nondiscriminatory reason for denying her tenure and letting her go when her contract expired.

Specifically, Buffalo State asserts that Baldwin's lack of scholarship production overrode her admittedly excellent teaching ability, warranted her non-renewal, and made any other conflicts within the department irrelevant. Baldwin responds that she received positive feedback right until she relayed student complaints to college administrators. The denial of tenure plus other instances of office discrimination occurred only after she spoke out about the complaints, according to Baldwin.

The Court has deemed Buffalo State's motion submitted on papers under Rule 78(b) of the Federal Rules of Civil Procedure ("FRCP"). For the reasons below, the Court grants the motion.

## II.    BACKGROUND

This case concerns Baldwin's allegations that speaking out for students who complained about her department chairman cost her tenure. Baldwin joined Buffalo State's Health and Wellness Department on May 24, 2002 for a three-year term that would run from September 1, 2002 to August 31, 2005. (Dkt. No. 25-3 at 72.) Buffalo State conditionally gave Baldwin the title of Assistant Professor, the condition being that she had to complete her Ph.D. by September 1, 2002. Otherwise, the title of Lecturer would apply. "Assistant professor is the normal beginning rank for a faculty member with a terminal degree or its equivalent and fewer than five years' experience elsewhere. A person appointed to this rank has established himself or herself as being qualified in the

discipline/profession.  In addition, there is the expectation that the person has the

potential for achieving excellence in the discipline/profession and for attaining the

highest rank in the department."  (Dkt. No. 25-3 at 83.)  At this point, Baldwin had

what Buffalo State called a term appointment.  "Term appointments may be

renewed for successive periods of not more than three years each."  (*Id.* at 81.)[1]

Baldwin did not complete her Ph.D. by September 1, 2002 and wound up serving

two terms as Lecturer.  When she completed her Ph.D. on December 17, 2005,

Baldwin received a promotion to Assistant Professor.  Baldwin served a total of

seven years as Assistant Professor.  (*See* Dkt. No. 25-3 at 95.)

Much of the argument in this case concerns what Baldwin had to do to

change from a term appointment to what Buffalo State called a continuing

appointment.  "Continuing appointment, commonly referred to as tenure, is

granted by the chancellor on recommendation of the president."  (Dkt. No. 25-3 at

81.)  "Three major promotion criteria are outlined in Article XII of the Policies:

Effectiveness in Teaching, Scholarly Ability, and University and Public Service.

Scholarly ability will be evaluated in the context of the approved departmental

statement on research, scholarship, and creative activity."  (*Id.* at 83.)  With

---

[1] Buffalo State has included in its motion papers an excerpt from the
August 2014 edition of its faculty handbook.  Although the August 2014 edition
obviously would have issued after the relevant events in this case, the parties
have not disputed that the same or substantially similar language would have
appeared in earlier editions that applied to Baldwin.  The Court will cite to the
August 2014 edition accordingly.

respect to scholarship, the Buffalo State faculty handbook contained a few

general criteria that would affect tenure and promotion to Associate Professor:

1. Scholarly/creative work or performance record beyond that demonstrated for the terminal degree. (There should be evidence that the person promoted to the rank of associate professor has completed substantial work in new or continuing investigations that demonstrate a cohesive line of thought in the discipline.)

2. Scholarship, creative works, and performance record (documented in visual media or through reviews) should be national in scope. (Reputation of the journals, sources of reviews, and extent of the performance record will be an important consideration.)

3. Significant work/research conducted, but not yet published, can also be provided at this stage of professional development. (The significance of the creative research/work should be attested to by reputable and established individuals in the field. It is important in these cases to attain a number of objective evaluations that testify to the quality and the value of the research, product, or performance.)

4. Invitations (particularly if unsolicited) to give readings, presentations, exhibitions, demonstrations, or workshops at major conferences, institutes, or universities also should be included.

5. Grants, awards, and particularly the quality of the works resulting from them are important for promotion to associate professor.

(*Id.* at 84–85.) Buffalo State established more specific standards for Baldwin at

different points in her career there.  A 2006 Memorandum of Understanding

("MOU") set forth that

Dr. Baldwin must continue to present papers at a minimum of two papers at regional and/or national conferences in the field of health

> education.  She must maintain National affiliations with professional
> associations and involve students with professional associations.  Dr.
> Baldwin must produce one published article before her promotional
> papers are forward to the Dean's office.  This article must be in a
> peer refereed journal in field of health education or health sciences.
> In addition, I would expect Dr. Baldwin to have contributed to one
> external grant activity; grant being funded is not mandatory.

(Dkt. No. 25-5 at 22.)  When Buffalo State administrators recommended

reappointing Baldwin in 2008, the recommendation noted that "Sue's scholarly

activities include several presentations at the College (2 for Annual Faculty/Staff

Research and Creativity Forums), regional (4 presentations in the Western New

York area), state (6 presentations; all of them were refereed), national (12

presentations; all of them were refereed), and one at the international level at the

Oxford Round Table session."  (Dkt. No. 25-5 at 28.)  The recommendation,

however, also included a concession that "[t]o date the only publication that Sue

has is the inclusion of her dissertation . . . . She is currently working on a variety

of publications, manuscripts and literature reviews."  (*Id.*)  "However, before being

considered for promotion Sue is encourage[d] to pursue an area of research

which will result in grant writing and a publication in a peer reviewed journal in the

field of health education or health sciences."  (Dkt. No. 25-5 at 30.)  "Providing

evidence of completing efforts in this area will be critically considered during the

next review.  Fulfilling these expectations would be a requirement for tenure and

promotion decisions."  (*Id.* at 31.)  A new MOU in 2009 contained the following

requirements regarding scholarship:

Scholarship: Research accomplishment can be documented by a variety of means: record of presentations, grant proposals, receipt of grants and contracts, preparations of textbook manuscripts and publications in peer-reviewed journals are all considered demonstration of scholarship. The best record of research accomplishment is one that includes peer-reviewed products (e.g. grant proposals and publications). In particular, publications (in print or in press) in peer-reviewed journals in the field of health education or health sciences will be expected by the time Dr. Baldwin applies for continuing appointment. When evaluating scholarly productivity, factors to be taken into account include quality of the scholarly work, the reputations of the journals in which papers are to be published, the reputations of granting agencies, and the nature of the candidate's contribution to a paper or grant proposal.

(Dkt. No. 25-5 at 33.) About a year later, in October 2010, Baldwin's department chairman[2] Scott Roberts ("Roberts") "enthusiastically" recommended a one-year renewal. (*Id.* at 35.) Roberts tempered his enthusiasm, though, with a concern "that to date no substantial publications are in print or in press. This could jeopardize a favorable review for continuing appointment next year." (*Id.* at 36.) Notably, all of the concerns about Baldwin's scholarship up to this point were expressed before any events in 2011 related to alleged discrimination. A year later, Buffalo State's continuing concerns about Baldwin's scholarship led Roberts to make a recommendation against tenure and promotion. Roberts wrote the following about Baldwin's scholarship:

Scholarship, in the form of publication, has been minimal at best over the past ten years. The commitment to publish scholarly work was

---

[2] Going forward, the Court will refer to Roberts as "department chairman" since the exact breakdown of when he served on an interim or permanent basis does not, in itself, appear to impact the events in this case.

an issue in my 2010 review, as well as, in the Dean's MOU. Published scholarship has been a concern as far back as 2008. In 2008 an attempt was made to clarify journals of appropriate merit. A ranked list of journals was solicited from SUNY Brockport's Department of Health Science. Brockport also provided appointment guidelines for the minimum number of publications needed. The list and guidelines were made available to Dr. Baldwin to help develop a focus for her published scholarship. The MOU drafted in 2009 specifies [that] publications (plural) in print or press should be completed for continuing appointment. The MOU also clarifies the reputation of the journal, the quality of scholarly work and the requirement of publication in peer-reviewed journals in the field of health education or health sciences.

**To date, Dr. Baldwin has one article in print and one in press.** The articles are well written and the article in print has a solid research component. My reservation regarding the article in print "Perceptions of International Faculty in U.S. Colleges" (International Journal of Science in Society) is that the article is lacking a health education focus and the journal itself is not a health education or health science journal. It is a modern science type journal. Considering the 2008 (Brockport) suggestions on the type of health journals acceptable for publication; the fact that Dr. Baldwin is the third author with no previous publications as first or second author; this published work is minimal evidence of published scholarship. The article in press "Professional Development through Planning for and/or Participating in Accreditation" in *Health Promotion Practices* is a solid health journal; however, her author contribution stated in her vita is only 25%. This is her only health journal publication after ten years of service. A 25% contribution to one article in ten years is not substantial evidence of published scholarship.

Dr. Baldwin still seems to lack the initiative to finalize scholarship presentations into published work. An example is her national refereed presentation in March 2010 on "Knowledge & Barriers to Colorectal Cancer (CRC) Screening among College Employees." Dr. Baldwin co-presented this research. It was sound and timely research. This was an opportunity to be first or second author, and yet no article was submitted. Dean Flood suggested years ago, that as soon as Dr. Baldwin was finished with her dissertation on Coordinated School Health, she needed to establish

a scholarly agenda. She never followed through and published her whole dissertation in a health journal. Dr. Baldwin's personal statement claims she is considered a national expert in the field of the Coordinated Approach to School Health and the School Health Index (SHI). There are scholarship presentations that may support such a statement. Published articles, to show further evidence of her expertise, have not been completed. This could have been critical in establishing her publication record. Dr. Baldwin could have established lead authorship on both projects, thus demonstrating the motivation and commitment to pursue published work. Dr. Baldwin cites four publications from the Pennsylvania Journal of Health, Physical Education, Recreation and Dance (PHPERD) (1997, 1998). These publications are not peer reviewed and 3 out of 4 are column features. (Per my conversation with the President elect of PHPERD). I feel there is little evidence and a minimal amount of peer reviewed published work after ten years of service (seven years on a tenure track). In my opinion, Dr. Baldwin has not developed the focus or a commitment towards published scholarly work.

Publication is, and always has been, crucial in higher education. The Buffalo State Directory of Policy Statement (DOPS) outlines that "There should be evidence that the person promoted to the rank of associate professor has completed substantial work in new or continuing investigations that demonstrate a cohesive line of thought in the discipline." In other words the promotion to associate professor requires scholarly work or a performance record beyond that demonstrated for a terminal degree. The promotion to associate professor and continuing appointment requires both a high and consistent level of performance on all criteria. Unfortunately, Dr. Baldwin has not met the minimum requirements in the area of scholarship. With this foremost in mind, I regretfully state that I cannot support Dr. Baldwin for tenure or promotion.

(Dkt. No. 25-5 at 39–41 (emphasis added).)

Buffalo State provided Baldwin a chance to rebut Roberts's recommendation, and Baldwin did so. (*See generally* Dkt. No. 34-2 at 449–57.)

Baldwin contested many of the points that Roberts raised in his recommendation.

With respect, however, to the actual number of published articles that she produced while on tenure track, Baldwin agreed with Roberts. "To date since the MOU of 2009 I published two articles, one in print and one in press, and one is under review at this time." (*Id.* at 453.)

Buffalo State ultimately let Baldwin's last term expire effective January 11, 2013. In the request for personnel action leading to the non-renewal, Baldwin received one recommendation for promotion to Associate Professor and three recommendations that her term expire. (Dkt. No. 25-4 at 51.)

While Baldwin's history of scholarship ran its course, her relationship with Roberts began changing as far back as 2006. In April 2006, Baldwin, Roberts, and others attended a work conference. One evening, Roberts allegedly asked Baldwin about her sexual orientation and reported that someone had been spreading rumors that her partner was a graduate student. (Dkt. No. 34-2 at 54–56.) After Roberts's inquiry, Baldwin's relationship with him changed "somewhat" in that "we were friends up until that point." (*Id.* at 56.) For some period of time before 2011, Baldwin would hear students complain about inappropriate comments that Roberts would make in the classroom. (*Id.* at 56–57.) Roberts also took less of a "team approach" to certain administrative tasks, but Baldwin "would be speculating" to attribute that change to discrimination. (*Id.* at 59.) Baldwin involved herself more directly in Roberts's classroom conduct in early 2011 when students began approaching her with

details of comments that he would make.  Most if not all of the alleged comments had in common graphic and lewd descriptions of the physiology of sexual intercourse.  Even for courses dealing with human health issues including sexuality, the students allegedly felt uncomfortable with comments that Roberts would make.  In March 2011, Baldwin met with Roberts to relay the student concerns about his classroom comments.  Shortly thereafter, Baldwin also brought the student complaints to the attention of Buffalo State administrators.

Baldwin allegedly began experiencing retaliatory acts after reporting what she heard about Roberts's classroom conduct.  Departmental staff stopped helping Baldwin with various administrative responsibilities and withheld teaching evaluations, supplies, and classroom technology.  Baldwin lost her role as the Internship Program Coordinator for her department and had to move to a smaller office.  According to Baldwin, Roberts went as far as to create doubt about her work with the Holland Central School District.  In 2006, Baldwin and another woman received a $500,000 grant for a physical education program that would be based at Holland Central Schools.  Roberts allegedly encouraged the co-author of the grant to overstate her role in the grant application, to create a suggestion that Baldwin lied about her own role.  Roberts took this step, according to Baldwin, to undermine her application for promotion and tenure.

The disputes that Baldwin had with Buffalo State eventually turned into administrative and legal action.  Baldwin filed a charge of discrimination with the

New York State Division of Human Rights on May 18, 2012.  The Division of

Human Rights cross-filed with the Equal Employment Opportunity Commission

("EEOC").  The Division of Human Rights found no probable cause on October

15, 2012.  The EEOC gave Baldwin her "right to sue" letter on February 8, 2013.

Baldwin commenced this case by filing her complaint on May 8, 2013.  The

complaint contains three claims.  In the first claim, Baldwin accuses Buffalo State

of retaliation in violation of Title VII.  In the second claim, Baldwin accuses Buffalo

State of retaliation in violation of Title IX.  In the third claim, Baldwin accuses

Buffalo State of Title VII discrimination in the form of negative job reviews after

she complained about Roberts's classroom conduct.

Buffalo State filed the pending motion on January 16, 2015.  Buffalo State

argues that Baldwin's reporting of Roberts's classroom comments cannot

constitute protected activity because Roberts would have had First Amendment

protection for candid conversations about human health issues including sex.

Buffalo State also points out that, while the students may have complained to

Baldwin, they did not complain to Roberts or to school administrators.  Perhaps

most importantly, Buffalo State argues that Baldwin exhausted her seven-year

developmental time and simply did not qualify for tenure.  According to Buffalo

State, Baldwin did not publish enough scholarly articles of peer-reviewed quality

to merit tenure.  After repeated warnings about a deficiency in scholarship,

Baldwin ran out of time to address the deficiency.  Buffalo State asserts that none

of Baldwin's allegations of adverse workplace actions changes the basic information about her scholarship.

Baldwin opposes the motion for several reasons. Baldwin asserts that Buffalo State downplayed the significance of her academic writing and presentations and of the $500,000 physical education program that she helped develop at the Holland Central School District. Baldwin asserts further that Buffalo State botched her tenure review process by not including a proper personnel committee that could help provide feedback. Buffalo State did not follow proper procedure, according to Baldwin, because it made up its mind in advance to get rid of her and cut corners to reach that outcome. Finally, Baldwin cites her various disputes with departmental staff as examples of adverse workplace actions that did not begin until she reported Roberts's classroom conduct.

## III. DISCUSSION

### A. *Summary Judgment Generally*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary

judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

### B.    *Did Baldwin Engage in Protected Activity Under Title VII?*

The parties have addressed a number of issues in their motion papers, but the Court first focuses its attention on a deeper question. As the above subheading states, did Baldwin engage in "protected activity" that would satisfy the first element of a Title VII retaliation claim? A Title VII retaliation claim first requires that a plaintiff engage in protected activity. The protected activity can take a variety of forms, but it has to be some kind of protest against conduct that Title VII forbids. *See* 42 U.S.C. § 2000e-3(a) (Westlaw 2015) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because he has opposed any practice *made an unlawful employment practice by this subchapter.*") (emphasis added), *quoted in Kessler*

13

*v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006) ("Title VII forbids an employer to retaliate against an employee for, *inter alia*, complaining of employment discrimination prohibited by Title VII.").  A plaintiff's belief that her employer was violating Title VII need not be accurate; good faith will suffice, but the conduct in question still has to relate to employment.  *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) ("With respect to the first element, participation in protected activity, the plaintiff need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying *employment practice* was unlawful under that statute.") (emphasis added) (internal quotation marks and citations omitted).  If the conduct subject to protest falls outside of Title VII's scope then so does any claim of retaliation against the protest.  *Cf. Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 135 (2d Cir. 1999) (affirming judgment as a matter of law for defendant where "[plaintiff's] claim of retaliation is not cognizable under Title VII because his opposition was not directed at an unlawful *employment practice* of his employer") (citations omitted).

Here, the conduct that students reported to Baldwin and that Baldwin reported to Buffalo State administrators did not fall within the scope of Title VII. Students complained to Baldwin that Roberts used sexually inappropriate language when lecturing them in the classroom.  "Courts have repeatedly held,

however, that a teacher's complaints about alleged discrimination directed against a student do not constitute opposition to an unlawful *employment* practice." *Palmer v. Penfield Cent. Sch. Dist.*, 918 F. Supp. 2d 192, 196 (W.D.N.Y. 2013) (Larimer, *J.*) (citations omitted); *cf. Wimmer*, 176 F.3d at 134–35 (finding no protected activity where plaintiff claimed retaliation for having reported overhearing racial slurs made by police officers against non-employee black citizens). As far as the Court can tell from the record, the students in question were simply students who registered for one of Roberts's courses. The students were not interns or researchers and were not under any sort of employment control by Roberts. As broad as Title VII's protections are, Congress wrote the statute to address discrimination in the workplace, not the classroom. Baldwin thus cannot sustain her claim of retaliation under Title VII, and the Court accordingly grants Buffalo State's motion with respect to the first claim in the complaint.

### C. *Does Baldwin Have a Remedy Under Title IX?*

Next, the Court has to assess whether Baldwin can assert liability and damages under Title IX. "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (Westlaw 2015). "Retaliation against a person because that person has complained of sex discrimination is another

15

form of intentional sex discrimination encompassed by Title IX's private cause of action. Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subjected to differential treatment. Moreover, retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination. We conclude that when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005) (citations omitted). "As in the context of Title VII, a plaintiff claiming retaliation under Title IX must first establish a *prima facie* case by showing: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action. Close temporal proximity between the plaintiff's protected activity and the . . . adverse action may in itself by sufficient to establish the requisite causal connection. Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. After the defendant has done so, the burden shifts back to the plaintiff to demonstrate that the articulated reasons are pretextual." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91–92 (2d Cir. 2011) (ellipsis in original) (internal quotation marks and citations omitted). In contrast to Baldwin's

Title VII retaliation claim, a retaliation claim under Title IX does not appear to require a connection to employment practices. *See Burgess v. Harris Beach PLLC*, 346 F. App'x 658, 660 (2d Cir. 2009) (summary order) ("Neither the Rehabilitation Act nor Title IX, however, are limited to discrimination against employees.") (citations omitted).

Assuming *arguendo* that Baldwin has made a *prima facie* case of discrimination, Buffalo State has articulated a legitimate, nondiscriminatory concern about Baldwin's scholarship. "When a college or university denies tenure for a valid, non-discriminatory reason, and there is no evidence of discriminatory intent, this Court will not second-guess that decision." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 43 (2d Cir. 2000) (citations omitted). Buffalo State renewed Baldwin several times while repeatedly warning her that her lack of publication in peer-reviewed journals could jeopardize a future application for tenure. *Cf. Weinstock*, 224 F.3d at 43 ("Here, *ad hoc* committee members Tall and Silverstein testified in their depositions that they believed that Weinstock's publications and research papers were insufficient to merit tenure. They also testified that her research lacked originality and that the journals in which she published were not first-tier scientific journals."). The warnings came from the faculty handbook, from memoranda of understanding, and from prior recommendations for renewal. As late as the 2010 renewal, Roberts praised other aspects of Baldwin's employment but warned Baldwin explicitly that Buffalo

State would have to decide on tenure the next year, and that the lack of substantial publications could jeopardize a favorable decision. In his 2011 recommendation and her subsequent rebuttal, both Roberts and Baldwin agreed that her time in the tenure track led to a grand total of two articles, "one in print and one in press." Baldwin emphasizes that she had three articles submitted for publication at the time (Dkt. No. 34-2 at 116) but has not asserted that any of those articles were published before Buffalo State had to make a decision about tenure. In short, by the seventh year of Baldwin's tenure track, Buffalo State faced the same decision that it would have had to make with or without any other issues concerning Roberts's classroom conduct. *Cf. Guntur v. Union Coll.*, No. 88-CV-1080, 1992 WL 209322, at *9 (N.D.N.Y. Aug. 19, 1992) (granting judgment to defendant where plaintiff "was able to demonstrate nothing more than the existence of professional disagreement about the quality and importance of his scholarship. Such disagreement, however, does not constitute discrimination within the meaning of Title VII."). Any minor irregularities concerning exactly which committees lined up to provide feedback do not change the notice about scholarship that Baldwin received for years. *Cf. Tori v. Marist Coll.*, 344 Fed. App'x 697, 701 (2d Cir. 2009) (summary order) ("While departures from tenure procedures can raise a question as to the good faith of the process where the departure may reasonably affect the decision, summary judgment is appropriate where there is no evidence that discrimination played a role in any

18

alleged procedural irregularities.") (internal quotation marks and citation omitted).

Under these circumstances, letting Baldwin's Title IX claim go to trial would

require, in some way, that a jury consider whether two published articles while on

tenure track constitutes deficient scholarship. The Court will not allow second-

guessing of academic standards for tenure. *See Bickerstaff v. Vassar Coll.*, 196

F.3d 435, 455–56 (2d Cir. 1999) ("Vassar alone has the right to set its own

criteria for promotion and then to evaluate a candidate's fitness for promotion

under them. Our role is narrowly limited to determining whether an illegitimate

discriminatory reason played a motivating role in the employment decision.")

(citations omitted). The Court thus grants Buffalo State's motion with respect to

the second claim of the complaint.

### D. *Baldwin's Third Claim*

Assessing Baldwin's third claim will not take much time because of its close

connection to her retaliation claims. In her complaint, Baldwin asserted no

problems with her employment "until after she brought student complaints of

Chairman Roberts' sexually graphic language in the classroom to Respondent's

administrators and supervisors." (Dkt. No. 1 at 14.) Since most of the alleged

discrimination occurred in response to speaking out about student complaints,

Baldwin's discrimination claim amounts to a retaliation claim. As explained

above, Baldwin has no remedy for the alleged retaliation because she did not

protest an employment practice under Title VII.

Any other references to discrimination apart from the retaliation do not cross the threshold for Title VII discrimination.  Baldwin mentions in the third claim of the complaint that Roberts "discouraged a pregnant employee from returning to work."  (*Id.*)  That employee was not Baldwin.  Even if Roberts "insisted on hiring a male candidate even if there was a more qualified female candidate," (*id.*) defendant ultimately hired Baldwin.  In his 2011 recommendation, Robert cited a number of issues concerning Baldwin and intra-departmental conduct.  None of those issues would be actionable under Title VII. *Cf. Demoret v. Zegarelli*, 451 F.3d 140, 150 (2d Cir.2006) ("There is little, if any, evidence to suggest that Douglas's close monitoring of Demoret's work, his mild rudeness to her, or his failure to take advantage of all of her abilities was motivated by gender discrimination.  Likewise, there is little evidence that the Administrator was discriminating against Demoret on account of her sex when he assigned responsibilities formerly handled by her, such as maintaining custody of the mayoral stamp, to other female employees.  Further, this treatment was not so severe as to be abusive."); *Janneh v. Endvest, Inc.*, 64 F. App'x 814, 816 (2d Cir.2003) (summary order) (affirming summary judgment and finding no hostile work environment based only on a supervisor who was "impolite, sarcastic, antagonistic, and totally rude"); *Batchelor v. City of New York*, 12 F.Supp.3d 458, 479 (E.D.N.Y.2014) ("These actions, considered in their totality, paint a picture of a challenging working environment where Plaintiff was subject to rigid forms of

discipline, but, assessing the severity, frequency, and degree of Defendants' alleged abuse, the Court does not find that they created a workplace so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of Plaintiff's employment were thereby altered.") (editorial and internal quotation marks and citation omitted). Roberts did not cite those issues as the ultimate basis for his recommendation anyway. (*See* Dkt. No. 25-5 at 41 ("Unfortunately, Dr. Baldwin has not met the minimum requirements in the area of scholarship. **With this foremost in mind**, I regretfully state that I cannot support Dr. Baldwin for tenure or promotion.") (emphasis added).) Finally, Baldwin stated in her deposition that her relationship with Roberts changed for the worse as early as 2006 when Roberts began asking her about her sexual orientation. Even after that incident, Roberts and Buffalo State continued to support Baldwin's renewals until 2011. That Roberts and Buffalo State supported Baldwin undermines her claim that Roberts discriminated against her on the basis of sex or sexual orientation.

The Court thus grants defendant's motion with respect to Baldwin's third claim. With Baldwin's claims having failed on the bases described above, the Court finds that addressing any other issues raised by the parties is unnecessary.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court grants Buffalo State's motion for

summary judgment.  (Dkt. No. 25.)  The Clerk of the Court shall close this case.

SO ORDERED.

_____/s Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: August 28, 2015